Good afternoon, Council. We will call the case of In Re Energy Future Holdings. We will hear first from Mr. Bonner. May it please the Court, my name is Jim Bonner. It's my honor to represent Appellant Nextera in this proceeding. I'd like to reserve three minutes for rebuttal, please. The first of two overarching questions before the Court is whether Nextera has plausibly alleged that it suffered unfair prejudice as a result of the Bank of St. Clair's reconsideration order and its subsequent dismissal of Nextera's expense application. Nextera's allegations leave no doubt that the debtor's conduct caused Nextera severe, unremitted prejudice. Nextera's shareholders have only $60 million in unreimbursed expenses to show for Nextera's determined efforts to close that merger transaction with Encore. And both the Bankruptcy Court and this Court recognize that Nextera took all of those steps in reliance on the party's merger agreement and the Bankruptcy Court approval order. In contrast, Elliott, a vulture investor that bought nearly all of its bonds after the Bankruptcy Court approved the termination fee, is enjoying a windfall. Elliott stood idly by for a year while Nextera pursued aggressive efforts to try to close that transaction and expended $60 million in an effort to do that. Elliott and the debtors then succeeded in leveraging Nextera's efforts into an alternative transaction with SEMPRA that the debtors and the creditors viewed as more attractive to them. So can I ask you a couple of threshold questions? The Bankruptcy Court had looked at the language of 6.7 as essentially a waiver of a right to administrative expenses. The District Court didn't reach that issue because it was addressing the motion to dismiss rather than what came up under the offices of summary judgment. For our purposes now, granted we have plenary review of the Bankruptcy Court, but as the District Court didn't reach that, I'm going to call it a waiver issue, can we and should we? I think, Your Honor, the first answer is can you, of course you can, it was something that was raised below, so the Court certainly has it in its discretion to reach that bar issue under Section 6.7 of the merger agreement. Should you rule that it's barred, I think the clear answer to that is absolutely no, Your Honor. We explained that in the recent supplemental briefing that we filed with the Court. But what basically Section 6.7 says is that if there are certain administrative expenses that are addressed in what was the Nextera plan of allocation, that those expenses would then be collectible by Nextera. And the argument that the appellants or appellees are making is that those expenses were not addressed in, quote, the Nextera plan because they were not specifically allocated or provided for in the Nextera plan. But the truth of the matter, Your Honor, is that there were no expenses that were specifically addressed in the Nextera plan. Rather, the plan simply said that all of the debtors' administrative expenses would be paid for. Can I just ask you a practical question, or maybe from your perspective it's an impractical question, but how would a plan go about allocating administrative expenses? I mean, some of those expenses would be accrued before the plan's approval date, some would probably occur on the plan's approval date, and some would probably occur after the plan's approval date, potentially. And so it seems that a request for a specific itemization, does that ever happen? Or is just these four categories, at least that I read under the administrative claim heading, are those good enough under your view for Section 6.7? I think the answer is that there could potentially be some claims that would be specifically addressed in the plan, Your Honor. But generally what happens in bankruptcy proceedings is that there are certain categories of claims that the court, that are set forth in the plan, and then the court adjudicates whether those are going to be allowed or not allowed at a later date. And then you see how much money is left in the estate at that point in time, and certain percentages are allocated between either secure creditors or unsecured creditors or whatever other groups of people are entitled to receive payment under the plan. So a practical question, if your position in Section 6.7 is ambiguous, right? No, I think it's quite clear, Your Honor. It says that if these expenses were addressed in the next error plan, that they are compensable. And here we have a plan that said that all of the debtor's administrative expenses were going to be paid for, and this qualifies as an administrative expense. Well, let's say hypothetically we determine that in fact it is ambiguous. Generally what happens then is the fact finder decides what in fact it means. And generally the fact finder would be the jury, or in some cases it would be the trial judge. So in this instance, if we were to determine that it was an ambiguous provision, what are the next steps? I think at that point, Your Honor, the court would remand the case back to the bankruptcy court, and then there would be proceedings based on the court's ruling, of course. Would there be discovery, or it would be public record? I think, Your Honor, if you found that it was ambiguous, there would probably have to be some discovery done as to what the party's intentions were at the point in time that this provision was drafted. I think another very important point about this Section 6.7 is that we've alleged four different theories of relief in our expense application. Three of them don't require any showing that there has been a benefit conferred on the debtor's estate. And as a result, Section 6.7, which applies only to claims for administrative expenses, wouldn't bar any of those other three categories or theories of relief that we've asserted. Number one, we've said that the court said in EFH opinion that if a party suffers uncompensated prejudice as a result of a reconsideration motion, and that's exactly what happened here, that the court has to undertake efforts to make sure that that party is not prejudiced by that reconsideration motion. Number two, we've shown that the Supreme Court's decision in Redding, which concerns the fundamental fairness doctrine, has a similar effect. It says that if, as a result of the debtor's conduct, a party suffers unfair prejudice, that the court has to undertake efforts to make sure that that prejudice is remedied. And number three, we have Section 9.13 of the merger agreement, and that specifically says that if a court cancels out a particular provision of the agreement, and that has an important impact financially on one of the parties, that the parties then have to go back and they have to renegotiate their agreement in order to make it fair as close as possible to their intentions at the point in time they entered the merger agreement. So there are four different theories of relief. Only the last one, which concerns administrative expenses under Section 503 of the Bank Street Code, really gets into this issue of the contractual bar. All $60 million relates to a claim for administrative expenses. It does not? It's administrative expenses, Your Honor, but the requirements are different under these various theories. I'd like to ask you about 6.7 and one of your theories, that the language of 6.7, it talks about administrative expenses of the debtors' estate addressed in the plan of reorganization, and then 8.5 talks about the termination fee to the extent that it's approved by the bankruptcy court as constituting an administrative expense, and also makes clear that one component of that is the expense reimbursements including reasonable and documented professional fees of parent and merger sub. When a district court entered its order of reconsideration, it seemed to carve out the notion that while the termination fee itself was not going to go forward, that nonetheless, it should not be read to preclude a request for allowance of the administrative claim, but it provided in a parenthetical on a ground other than the grounds on which the termination fee was denied in this opinion and order. I can understand the argument that to the extent that there was an exception to the provision for each party bearing their own costs that rest in administrative expenses of the debtors, and originally that included the termination fee. When the bankruptcy court changed its view about the termination fee, it sort of carved out that component that had already been designated an administrative expense, but when it did so in the order on the motion for reconsideration, it only did so on grounds other than the grounds on which the termination fee was denied. Are there grounds for your seeking the administrative expenses here that are different than the grounds on which the termination fee was denied? There are multiple reasons, Your Honor, multiple bases other than the grounds on which it was denied. First of all, what courts have said about what's preclusive or what prevents a party from seeking relief under another theory is that it has to be the same issues that were raised at the point in time at which the decision was made by the courts. Here we have two very different issues that were being considered by the court, A, at the time that the termination fee was denied, and now when we're dealing with the administrative expenses. Back at that time, it was $275 million that related in no way to any of the actual expenses of NextEra. At this point, we're talking about $60 million in expenses that were actually expended by NextEra. These are different issues. Apologies, my question wasn't clear. I'm not asking you about the collateral estoppel or issue preclusion. I'm asking about the theory resting on 607. If I understand it correctly, and please correct me if I'm wrong, but I thought that what you were arguing in terms of what survives as the ordinary course of business, that 607, I'm sorry, 6.7, while it generally indicates the parties will otherwise bear their own costs, it carves out administrative expenses that are addressed in the plan. It designates the termination fee as administrative expenses that would be and were understood as such within Nextel's plan. It identified the expense reimbursement as a component of the termination fee, and hence, administrative expenses. I thought you were arguing that that was a pathway to conclude that notwithstanding the language of each party bearing its own costs, except where it's been designated as administrative expenses in the plan, that these expenses, in fact, were explicitly carved out. Did I misunderstand that argument? I think that's true, Your Honor, but just to be 100% clear, Section 8.5 said that the termination fees are administrative expenses and that you won't be able to recover any administrative expenses if the termination fee is paid. That's what Section 8.5 said. Of course, the termination fee was not paid, so Section 8.5 doesn't bar us from seeking the administrative expenses. We're back to Section 6.7, and what 6.7 says is these are expenses that are addressed in the Next Era plan that they're compensable. Again, we say they are compensable because the Next Era plan provided for the payment of all of the debtors' administrative expenses. Ours are not differentiated from anyone else's. In fact, what we saw here was that the debtors' counsel and Elliot and others received administrative expense payments for working on the same merger that we were denied administrative expenses for. What we're saying is the contract is perfectly clear. The termination fee is out the window, but that limitation on collecting any administrative expenses is not applicable here, and 6.7 says if it qualifies it as an administrative expense, then we're able to collect them. I just asked you a question about – I know that you have kind of four theories of release. I think that two of them, in my view, are really mainline theories. You've got your reading path that comes from the Supreme Court. You've got your – I'll call it benefits path, and that kind of comes from statute. The one that you lead with, though, is your kind of – the EFH path, which is – you said this beforehand. When you denied us the termination fee, you said that courts have to make it all right and good or you can't prejudice. The all right and good wasn't in there. I guess my question, though, is this. You read that. Why isn't that just an end run around? Why don't you just seek $275 million for the termination fee back? Because that strikes me as what you've been most appropriately prejudiced. Then why do we measure prejudice based on your administrative expenses? Can we really create a separate cause of action just like that? I packed a lot into that question. Love your thought. I don't believe, Your Honor, that it would qualify as a separate cause of action, and I don't necessarily think that the $60 million is the be-all or the end-all in terms of what our prejudice is. But certainly, we've suffered enormous prejudice. I think if we went back to the district court or to the bankruptcy court, there could be some fact-finding made with respect to whether certain expenses fit in or they don't fit in. But what the court said and what the law that it cited in its opinion said, the Roberts case, Williams case, those are Third Circuit opinions, it said that if there's a reconsideration order granted, the court has to, mandatory, must take efforts to remedy any prejudice that was caused. Now, clearly here, Your Honor, there would have been no steps undertaken by Nexterra, none whatsoever, to get this merger closed. If the court had, at the time it was to bless the merger agreement, said, I'm not going to bless the termination fee. We would simply have exercised our right to terminate the transaction. We wouldn't have spent $60 million, and the debtors would have gone on their merry way to try to sell that asset to somebody else. So it seems like maybe the measuring stick for this unfair prejudice would be the date that the initial order was issued and then the date that it was reconsidered. And it would seem that within those measuring sticks, you would get all of the expenses under this theory. You might have reasons to get outside of this window other theories of administrative expenses. But this theory would be limited to those two dates. Is that right? I think that's fair, Your Honor. The time between those two dates. Correct, Your Honor. That's exactly correct. Let me drill down quickly on your argument that the Third Circuit mandated an award of administrative fees. Now, in stating that the lower court must take appropriate steps so that the parties are not prejudiced by a reliance on the prior rulings, wasn't it simply doing what appellate courts do all the time, telling the district courts what procedure to follow in deciding an issue? And couldn't it, if it had in fact meant something different, had been much more precise, it could have, if it intended to mandate an administrative fee, say something along the lines of next era has an alternative way to recover expenses because it is entitled to the administrative fee. I do suppose that there could have been more specific language in the court's opinion, Your Honor, but the court did use mandatory language. And we've cited cases that said that if the court says you must address that prejudice, that that means exactly what it says, that you must address that prejudice. And I would also point out, Your Honor, that in addition to simply saying that the Banksy court had to address this prejudice, the court also specifically pointed to our expense application as a potential means for remedying the prejudice that next era had suffered. So not only did the court say something has to be done in order to remedy the prejudice, it said here's a particularly good avenue for seeking to do that. And again, Your Honor, it may be that the court, when we go back to the Banksy court, they may knock out some of these expenses. But the fact of the matter is we have a grossly unfair situation here where next era is at $60 million. The debtors and Elliott took advantage of next era's efforts to try to close this transaction. They found another bidder based upon the fact that a really well-respected utility like next era was willing to put a premium bid on the table. And we're at $60 million, and they have an alternative transaction. Can I push back a little on that? Let me just push back a little on that because I want to not take issue with what you said, but to hear what your response is. I mean, maybe as soon as the termination fee was denied, let's say you said we aren't going to appeal. We aren't going to take the, not denied, but you know, the conditions, the PUCT order came out. You said we aren't going to seek appeal of that anymore. We're just going to drop it. It seems to make sense to me that in that situation, you're well-poised to say all of our efforts to date are going to benefit anyone else who wants to subsequently buy this 80% interest. Because we've done it, and now we're done. We're backing out. Not the allegations, but as the briefs say, as time went on, by not kind of releasing that deal, but instead following a contractual provision that, again, could have been breached, the estates lost like $50 million a month, I think is what the allegation is. So when you measure prejudice, it seems that maybe if NextEra walked away that day, your prejudice points are at zenith. That's a really good point. But then the longer that you go and say, ah, we want to keep pressing this, we want to keep tying up the estate, granted for, you know, reasons to complete the deal, the prejudice point goes down, because NextEra is deriving a benefit of its own by pressing those appeal matters in Texas state court. So when we look at fairness or when we look at benefit or maybe even when we look at prejudice, you know, doesn't timing matter a lot? I think that is the case, Your Honor, and that's one of the reasons why I say that we need to go back to the bankruptcy court and determine what the prejudice is here. These are fact-intensive issues that you're just speaking about. Did we create a benefit?  So those are fact-intensive issues that should not have been adjudicated in the context of a motion to dismiss. And I think a very, very important point with respect to this prejudice issue that the defendants or the LEs argue, they claim we cost them $600 million by pursuing this particular transaction. And I think that the facts that are alleged and the economic circumstances here, Your Honor, they simply don't support that. They want to add $350 million to the reported damage that the estate suffered. And that's only $350 million in a lower transaction price, because as we explained in the briefs, they agreed to sell very, very different assets to SEMPRA than the assets that they sold to us. We were going to have full control over Encore. We were going to be able to appoint our directors as we wanted, run the company whichever way we wanted. We were going to be able to declare dividends and collect our money on any date that we wanted. They had to, because of our efforts, it was made obvious that the PUCP would never accept that. And so as a result, they had to sell these burdened assets, which, and again, they repeatedly told the PUCP that these burdensome conditions were, in fact, very burdensome, that they affected the market price of Encore, that they were unfair, that they were anomalous, they called them, they called them other adjectives. So to say that we cost them $350 million is simply untrue. And then secondly, with respect to the interest factor, they want to add five months of interest on to this before it costs $250 million. But we need to keep in mind, Your Honor, that we have an enterprise here, Encore, that has an $18 billion enterprise value, $18 billion. And it's throwing off cash flows every month. And the reason why NextEver was willing to pay so much money for it, and eventually that Semper agreed to pay so much money for it, is that it's a very valuable asset. But they only want to look at one side of the income statement. They want to look at how much the cost was, have that debt that allowed them to run Encore month after month after month. But they don't tell us anything, not a word, about the revenue that they were generating from this $18 billion enterprise. Counsel, as I understand it, we don't look at prejudice in the abstract as a basis for granting administrative expenses. There's a theory of fundamental fairness under Redding, but that seems predicated on the existence of a tort and establishing a substantial claim of that, which we could talk about separately. But the other basis is 503, and it's certainly not apparent on the face of our prior opinion that we were contemplating anything other than an application for expenses under 503. And that route would require you to show that there was a benefit to the estate. All right. Is that analysis going to be any different than the analysis that was already conducted in connection with the termination fee? And if so, in what way? I would just respectfully disagree with the concept, Your Honor, that your prior opinion only allowed for things that qualify under Section 503. The very first opinion that the court cited saying that you had a remedy of prejudice when a reconsideration motion was granted was the Roberts decision. It's not a bankruptcy case, and it most certainly is not a case that involved the 503 issue. So I would say that the court's not only contemplating the 503 issue, but also in the EFH opinion was contemplating more generally situations where someone is prejudiced. Secondly, Your Honor, I do think that the facts that are alleged in the expense application, they bear out the fact that Nextera created enormous benefits for the estate here. First of all, we have a very well-respected participant in the marketplace, Nextera, comes forth and puts in a premium bid for these assets. It then serves as a stalking horse for the debtors and for the creditors. And notably, Your Honor, they did not stop this transaction until the day that they finalized their alternative transaction with SEMPRA. And that conduct is completely consistent with the cases and what the academic literature say is that situations where there are multiple bidders for assets generally produce higher asset prices. And so in this circumstance, we were a classic stalking horse, Your Honor. We are a really well-respected utility, put this enormous number on the table, and discovery will show that SEMPRA was looking at that when it put its own bid together. In addition... The Bankruptcy Court looked at that and determined that that would be an appropriate characterization if perhaps the final price had been greater and not significantly less. Why is that not within the District Court's discretion to take account of the various factors, positive and negative, that conclude there was not a benefit? I think the problem with the Bankruptcy Court and the District Court analysis, Your Honor, it took a very, very simplistic view. It just said lower bid, and as a result, no benefit created. But that analysis does not take into consideration this bundle of sticks metaphor that we explained in our briefs. They agreed to sell us assets that were totally unburdened by these restrictions, these burdensome conditions that are specified in the merger agreement. When they turned to sell to SEMPRA, they had to sell them for a much lower price because they were selling different assets. They were selling assets that were burdened by all sorts of restrictions on dividend declarations and by the ability of SEMPRA to control the entity that it owned 100%. It's certainly not the norm. If you buy a house, people don't get to tell you how much you can rent it out for. They don't tell you what price, what color you're going to paint it, and they most certainly don't tell you when you can sell it and when you can generate dividends or returns on it. Again, to push a little against it, doesn't that cut a little against some of your rationale for administrative expenses? Because if they're two different assets, then all of your efforts to set value at market and to do all these other good things to close a transaction for asset one, and then what's actually sold is asset two, it seems that the benefits that you provided for the sale of asset one don't necessarily transfer to asset two. Maybe that's just a question of fact. Maybe that's really a question of saying you think it was $60 million in administrative expenses. Maybe it was $12 million in administrative expenses. I guess my thought is when there are two different transactions, it gets harder at least to say that it's 100% recoverable, the efforts you put into transaction one, when what was actually consummated was transaction two. I would say it does make it certainly more complicated, Your Honor, to undertake that analysis, but I think it is certainly possible to do. We will get investment bankers or economists who will come in and they will say, what's the value of these assets unencumbered by these restrictions, and what's the value of those assets that are encumbered by the burdens and conditions? And we may well see in SEMPRA's own analysis that they had one price for one type of transaction and another price for a different transaction. And I think, again, the appellee's conduct speaks to this issue, Your Honor. Despite the fact that they had to know it was going to be more difficult to get this transaction through the PUCT without the burdens and conditions, they made the strategic choice to enter a deal with Nextera that provided for the removal of those conditions, because that was the only way that they were going to realize the highest possible value for these assets. And now they want to say, you know, it's really unreasonable that we didn't agree to the burdens and conditions or we should have canceled the merger. But their own conduct is they agreed to this transaction. They didn't cancel it until they had an alternative in mind. But getting back to the valuation point, I think that, Your Honor, is 100 percent correct. It's more difficult, but it's certainly not impossible to say that Nextera's efforts were a benefit to the debtors' estates because it provided this example. Is your legal argument there that the bankruptcy court misunderstood the nature of what constitutes benefits under 503 and that, therefore, misapplied it in disposing of your application? I think more that it made it a factual error, Your Honor, where it didn't consider the fact that these two different kinds of assets or total transactions were selling very different assets. So you can't just make a mathematical equation, one is lower than the other, because the second transaction is selling much less valuable assets. And that's a mistake. You can characterize it as a mistake of law. It may have been a mistake of fact. But I think it really qualifies as fact-finding that was engaged in by the district court and the bankruptcy court at the motion-to-dismiss stage, where we needed to have discovery undertaken, some expert testimony, et cetera, in order to say, did Nextera's conduct benefit the debtors' estates? And just to, if I can finish your thought for you, just to make sure I'm following it, your point is, we did enough at this point in time to make a plausible claim that we provided a benefit. Maybe discovery realizes, we realize that on balance, we actually, Nextera's conduct hurt the overall value. Maybe that's what comes out. But right now, you said, we think we've made a plausible claim and we want to go to the next stage and see what discovery reveals, because valuation is where this dispute lies. I think that's exactly true, Your Honor. I would certainly say that we need to get back and have some discovery taken about valuation. I think, Your Honor, also just to be fair to us, there are also some other benefits that Nextera did create. They, for example, they showed that there was no transaction going to get through the PUCT with the burdensome conditions in place. And there's no evidence or any suggestion anywhere that the debtors ever considered a transaction with those conditions in place before Nextera went out, spent all this money, and demonstrated that the PUCT would not approve that. In addition, we have testimony that's been delivered that the due diligence that Nextera did and some of the negotiation that they did with some of the objectors. And in addition to that, the deal documents that Nextera drafted all served as benefits or models that the debtors utilized in the transaction that they eventually signed with SEMPRA, and that expedited their ability to close that transaction. So that's another benefit that Nextera created. And all of those facts, in combination, are more than sufficient to create a plausible benefit for the debtors' estate that has to be returned to the families to be court in order for the court. Ms. Potter, if I could just note for Mr. McCain and Mr. Gilardi's benefit that we have well exceeded time, but we will certainly be giving you all time, too. This is a complicated and interesting case. Judge Biddlestone? Section 9.13, I have a couple of questions on that. Now, if we hold that Section 6.7 doesn't bar administrative fees, is there anything left of your Section 9.13 claim? I'm sorry, Your Honor, if you say it doesn't bar administrative claims? If we hold that Section 6.7 doesn't bar administrative fees, is there anything left of your Section 9.13 claim? I think so, Your Honor. There are these various theories. They're not competing. Each one of them independently provides for relief here. And if the court is to find that we could win under the administrative expense theory, we're certainly willing to pursue that. But simultaneously, we have this theory under 9.13. Now, that theory was raised, I think, for the first time. At least it doesn't appear to have been addressed by either court below. So wouldn't you have – is there an argument that you've waived that argument? Well, certainly there's an argument in briefs, Your Honor, that there has been a waiver. But I think that we addressed that well, hopefully successfully. The cases say – we cited some Third Circuit opinions. There was a Bigger Foot Architect case. There was a GT, Advanced Technologies case. And what they say is the important point is that did you allege the facts on which your theory is based? It's not the label that's attached to them. So all these facts that are involved in the Section 9.13 claim or basis for relief, they're all in Nexterra's administrative expense application. We allege that there was supposed to be a termination fee. We allege that we proceeded on the basis of the court's approval order. We allege that the court eventually decided that it would reconsider that order. And we allege that there is a contract term which says that in a situation where someone is damaged by a court negating a contract term, that the parties have to go back and they have to renegotiate their agreement. So all those facts are there, Your Honor. In addition, in the lower court, while we didn't quote the one sentence from Section 9.13 that we've highlighted here in the Court of Appeals, Section 9.13 was a subject of significant argument between the parties. The impact on that on Nexterra's right to appeal or right to recover, rather. And all we're asking for here, Your Honor, is a fair extension of the arguments that were made by the parties about that very same section below in the District Court and in the Bankruptcy Court. And again, the Third Circuit opinions say that you can, on appeal, make a fair extension of arguments that you've made previously. So quite apart from what happened in the courts below, there was also a duty to negotiate. I think both parties had a duty to negotiate, but you didn't. So having you waived it, quite apart from the legal issue, you waived that provision in that you did not negotiate, renegotiate. And if you were going to renegotiate, what would you do at this point? Well, we were always willing to renegotiate, Your Honor. We just got the Heisman from the debtors once they won the reconsideration. But don't you have to have those allegations in your complaint in order to state a plausible allegation? I mean, at one level, it's one thing to say the legal argument we just now came upon based on facts that we had in there. But, I mean, don't you have to say in your complaint that you had a contract term that required renegotiation, you took efforts to renegotiate, and those efforts were rebuffed? And, I mean, is that in the complaint? I do think it's fairly—Your Honor, it doesn't directly say that, certainly. And the complaint certainly could have been more clear about this issue. But the facts that are alleged in the complaint make it clear that there was negotiation between the parties beforehand about— But a duty to negotiate, because, I mean, this is a duty-based cause of action. Now, this isn't just it would be nice if, but it's we want to compel you pursuant to a contractual duty to do so. I guess my thought is usually when someone wants a court to enforce a duty, they plead it in their complaint. And so I guess my question is, does your complaint plead such a duty in breach? Those are typically elements of a breach of contract. I think fairly, Your Honor, that the complaint does encompass those issues. It doesn't say it directly. It should have been done better than it was. But here we are at the—It's really the first time that these allegations have been made. If the only problem is that we need to amend the application and to assert this theory more directly, then I think that could easily be done on remand. So the real issue is, did we waive this? And it was discussed in the briefing in the district court and in the bankruptcy court. But I certainly understand, Your Honor, it should have been done better than it was. So what you're saying—So, again, just to understand what you're saying, you're saying, look, even if we didn't get it right then, our complaint shouldn't have been dismissed with prejudice. We should have had a chance to go and fix whatever deficiencies were there. The problem with that argument is, of course, it wasn't squarely presented to the district court. So when the district court decides whether or not to dismiss something with prejudice, it's kind of hard if they don't have the arguments that you want to have a basis to evaluate whether a memo would be futile. I understand completely, Your Honor. I would say—I think it probably fits within what was alleged. It should have been done better. But at the end of the day, there are two other theories that basically turn on the same facts. There's a theory under the court's EFH opinion. It revolves around the prejudice that we suffered. There's also the fundamental fairness doctrine under the Redding case. In either situation, it's basically the same facts that will entitle Nextera to relief. So even if the court were to find that 913 was not fairly raised below, it's not going to have an impact on the outcome of this decision. Counsel, could we look back just briefly to 6.7 on the waiver argument there? You said you should be entitled to administrative expenses just like everyone else. Is there anything in the record indicating that other unsuccessful bidders had their administrative expense put in for administrative expenses and had those applications approved? I do not believe so, Your Honor. But I would point out that on a very closely related point, that the debtors, Fidelity, and other entities had their expenses paid in relation to the Nextera merger transaction. So the very same transaction for which we're being denied administrative expenses, there were other entities that were paid their administrative expenses. So the court obviously found that there were things about this transaction that merited the payment of administrative expenses. Okay. We'll come back to you on rebuttal. And I know I just divided up your time, Mr. Ghilardi and Mr. McKee. We'll let you proceed in the order you prefer. Mr. Ghilardi, you're muted. Let me get it off the first mute. Sorry. We have divided the time up 10 minutes for myself and five minutes for Mr. McCain. If it's even doable under the circumstances, I'll do my best to be as quick as possible. What I would like to start with is the point that Judge Phipps mentioned. And I do think it's important because I think it goes to the first women case, and maybe that is what he was thinking about. One point that you did raise was, well, isn't the time period, to think about it, day one where you approve the transaction, day two, reconsideration time period, and then moving forward. The problem with that, had they just terminated, and this was an expressly defined term and provision, they agreed in that circumstance, and this is one of the main facts, in the circumstance where they terminated, they did not get expenses. End of story. No matter how much work they had done, had they terminated, they did not get expenses. So this is not like the women's first case at all, because in women's first, you had an enforceable agreement with someone during that very short period of time, I think it's September 22nd to October 4th, that was still ready, willing, and able to close, had an enforceable agreement, and got compensated for the actual expenses for only that period of time. And I think that is a significant difference. I'm going to jump around a little bit because I think it will help for some of the questions. On that point, it sounds like some of the subtext here is an assertion that there was bad faith on the part of NextEra in continuing to pursue appeals through the PUCT and looking to a further appeal in state courts, but as I gather from the record, it appears that the debtors were supportive of those efforts and even to the extent of putting in amicus briefs. So if they're proceeding in good faith with the expectation that they will be able to close and that there was error in PUCT's initial decision, and doing so with the support of the debtors, why should there be a cutoff at the point that they're initially denied by the PUCT? Your Honor, we don't think that they should have received fees for any of that period of time, whether or not they were pursuing the appeal. What the bankruptcy court found with respect to 503B and what the court ultimately found in the district court is that at a certain point, there was no end date. There was all the leverage. So as the Third Circuit said, you have to balance what is the perspective gained by the termination fee vis-a-vis what is the risk. And what was done here was exactly that. They played the game to 275. Was it bad faith? No. Was it a failure to understand the circumstances as the bankruptcy court said? Yes. Was there an obligation to step forward and say there was a confusion? Yes. The bankruptcy court found that in both of those instances when it was considering the termination fee. Doesn't that bring us back to valuation at bottom? I mean, at absolute bottom. I mean, I get that all those say that the number of the value of administrative expenses should be low, you know, way below 60 million. But valuation is a different question because right now the question is, you know, ability to play for 60 or so million versus zero. And it seems that a lot of what you said goes to what the proper valuation is, and those may be successful arguments. But, Your Honor, it actually doesn't answer zero. Your Honor, but I don't think it goes to valuation at all. And let's get back to 503B and in particular. Why is 503B? And I'm a bankruptcy lawyer day to day. So let's start with the basics. 503B is an exception to the rateable distribution of assets among unsecured creditors. What 503B requires is that one creditor come in, seek to be elevated and be paid an administrative expense. To be elevated to pay that administrative expense, it has to be very simple, actual necessary expenses to preserve the estate. That is the only way, quite frankly, that you can get an administrative expense. And we'll get to the gentleman's prejudice argument. But when you look back at O'Brien, it says quite specifically that to get an expense, a statutory expense, it has to be authorized under the Bankruptcy Code, the statute. 503B is that statute. If you look at Judge Walrath's decision in Women's First, she rejects the equitable argument under 105. Another section of the Bankruptcy Code that you may be familiar with that says you can do things that the Bankruptcy Code doesn't expressly reject. Oftentimes, it's equity. She specifically, on the basis of O'Brien, rejected any other avenue for granting an administrative expense. She then went on, and although she found a reading situation fundamental, she still said it had to apply a 503B1 standard. They still had to show an actual benefit under 503B1. So 503B1 is the standard. Why? Because any time a creditor asks the debtor to pay its expenses, that depletes the creditor's assets. So the debtor's obligation is to decide whether that expense will maximize the benefit for the constituency it represents. So this is really, really helpful. I like it. I'm glad you brought that in. I guess my question is this, though. You have to show that none of this, in order for Bill, you have to say that it's not plausible, that anything that NextEra wants would provide an actual benefit. Well, actually, it's even stronger than that, Your Honor. It's not simply actual benefit. It has to be an actual benefit that was necessary to preserve the estate. It's not just one test. And there were cases out there, and I can give you an example. If I was a bidder at an auction, and there were three bidders. You bid first, I bid second, Judge Krause bids third. I got Judge Krause's bid up if you were never bidding. I gave a benefit to the estate, but my expenses are not reimbursed in that situation, because I didn't have an agreement, and that wasn't necessary to preserve the estate. So, if I was a bidder at an auction, and I bid second, Judge Krause bids third, and I gave a benefit to the estate, but my expenses are not reimbursed in that situation, because I didn't have an agreement, and that wasn't necessary to preserve the estate. The estate incurred $50 million of interest and fees after the deal killer terms. The estate had to go back to get another transaction. And the estate lost in that other transaction $300 to $400 million more. And what the record is clear is that with the next tariff bid, the unsecured creditors, who 503B is supposed to protect, went from a $0.10 recovery down to a $0.30 recovery. Those all came into play in denying the termination fee, but now we're talking about particular administrative expenses, and presumably they would have to tie those particular expenses to benefits to the estate. In terms of preserving it, many of the things that they're alleging that they did with those expenditures expedited the ability of the debtors to reach a further agreement, and ultimately with SEMPA. And time was clearly of the essence, as it appears that the debtors were prepared to trade higher consideration and continued appeals with the certainty of getting a deal done sooner. Why wouldn't that be sufficient on its face to at least go forward and process the application? I think there are two reasons, Your Honor. First, if you completely divorce, and I think you were getting to it before, if you completely divorce these expenses from the termination fee, you are divorcing them from the merger agreement that was the form of the transaction upon which NextEra filed its request for administrative claims. If you go back to the record, it's not a complaint. It's better than a complaint. They get to tell a story. The only basis upon which they proceeded on paragraph 45 and throughout is 503B1. You need a transaction. You need a merger agreement. The merger agreement said, 6.7 says, sorry, 8.5 says your sole exclusive remedy is the termination fee and the expenses. So that's the only basis upon which you could proceed. Therefore, you don't have a contractual transaction. And if they only… Your Honor, maybe you can help me, because as I read what was happening in the interplay of 6.7, 8.5, and then the bankruptcy court's orders, it looks like the parties agreed, and this is a contract, so we're looking to the mutual understanding of the parties. It looks like the parties had agreed that there would be reimbursement of administrative expenses. They had just been subsumed as a component of the termination fee. And so those administrative expenses, the parties had contemplated as being reimbursable. When the bankruptcy court changed its mind about the termination fee, it said explicitly that nothing in the order precludes next era from filing a request for allowance of an administrative claim. Why wasn't it just pulling out that component to say, still an administrative claim, you can go forward, that's a carve out from the provision otherwise of the American rule. Both parties pay your expenses. Well, there's a few reasons that you can't pull it out. One is the bankruptcy court simply doesn't have authority to rewrite the agreement that the parties wrote. So let's – but now let's go to 6.7 itself. 6.7 says it is your exclusive. You do not get expenses, administrative expenses, unless it falls within one of the exceptions. This was not one of the exceptions. Period. There was no other answer to be had there. Now – The termination fee, were it to be granted, was one of the exceptions, right? Correct. But it was not to be distinct as expenses. It was the termination fee, which was great enough to cover far more than the expenses. There was not a separate expense category, as you will see in many stalking horse agreements. They specifically did not include an expense reimbursement in the offense that the transaction did not close. That is common in restructuring for exactly this circumstance if somebody is taking a risk of closing. But why doesn't that, as Mr. Bonner was suggesting, simply indicate an agreement of the parties that if the termination fee was not going to be paid for whatever reason, they were still free to move forward with their administrative expense claim? Because 6.7 expressly said – says it's not if the termination fee doesn't get paid, come back under 6.7. It said you can't come back under 6.7 in any other circumstance. It never said that. Moreover, if Your Honor looks at the section about amending the agreement – and I think this is absolutely critical for his 9.13 argument – is the breakup fee provision 8.5 says the termination fee has to be – is subject to the approval of the bankruptcy court. So that's step one. Second, it's an administrative claim, and these words are very important, to the extent approved by the bankruptcy court. Ultimately, the bankruptcy court said I could not approve these – this fee on the grounds of O'Brien. So when it did that, that didn't say – and Nixtero went into the transaction with the view and with a contractual obligation to proceed on whatever terms the bankruptcy court ultimately approved the termination fee would be payable. The bankruptcy court determined it could not be payable under these circumstances. That's not an unenforceable provision. You see a lot of words about this is unenforceable, we should rewrite the contract. Two flaws with that argument. One, any counsel could have pled in the alternative in the request. By the way, if I don't get my expenses this way, parties should renegotiate, I should get a benefit. There is nothing in the administrative request to that effect. And that's not just an oversight of a sentence, because where they argued 9.13 was that the contract could not be severed. The provision could not be severed. The whole contract would have to be rescinded. They used the first sentence of 1.3 for exactly the opposite point. Let's go back again to what has been provided by the bankruptcy court in arguing for the termination fee to be rescinded. The bankruptcy court said explicitly that they aren't precluded from proceeding with that request. But proceeding with the request and granting the request and meeting the standard of 503B1 are quite different things. That was not before the court whether they had an alternative. That's a different issue. I understand and we can talk about whether they've met the O'Brien test as to the administrative expenses if we can tell that from this record. But that's a different issue than saying they've waived it on the face of the agreement. Because if we've got NextERA arguing for rescission on the basis that NextERA can still move forward with its administrative expenses, the bankruptcy court agreeing that in rescinding the termination fee, NextERA can still move forward with its administrative expenses, I'm not sure we can jump to the O'Brien standard to say we're not even going to consider the application. That is not what I'm trying to say, Your Honor. I'm saying this. If you look at the application that was filed and then the motion that I filed to dismiss and get summary judgment, it took up the allegations that they were still entitled to expenses under a 503B1 standard. That was the result of the reconsideration order, which the court said, I could not approve the termination fee. You can come back and make a request under 503B on any grounds other than the termination fee. That was not putting an imprimatur that they would be entitled to those fees. It was you make a request, subject to notice, subject to meeting the requirements, and I will consider it. Are we agreed that you are withdrawing the argument that they waived their right to even seek administrative expenses, which I thought had been one of the arguments you were making under the text of 6.7? No, I actually still believe that 6.7 precluded them from coming back. That was one of the grounds that we did make on the motions under the contract. Here we have four theories of relief. We have this EFH, uncompensated prejudice. We have 9.13, there's a need to renegotiate. We've got Redding and we've got a benefit theory. I think, and correct me if I'm wrong, is Redding and the benefit theory both being administrative expense theories, 503B1, theories grounded in 503B1. It strikes me as maybe 6.7 gets you to the point of saying that NextERA can't pursue its EFH, uncompensated prejudice theory and that it can't pursue its 9.13 theory. But what about 6.7 says that they can't pursue an administrative expense theory when the definition of administrative claim in the plan includes administrative expenses? Well, let's take two. First, let's start with a very simple point that the definition in the plan was a capitalized term, the NextERA plan. That plan was void of initiative. What they then tried to say is that it carried through each and every plan, no matter what. But that's not true under the contract. It was a very specific plan. It didn't say as amended, supplemented, or further modified, or anything else. It was the NextERA plan, which itself was void. So even if this court were to read it addressed in that way, that plan was never consummated. Let's go back to Your Honor's question before about what is it to be addressed in a plan. Many plans in restructuring address, you will pay the termination fee, you will pay A or B or C, an administrative claim. You do have that kind of language in plans all the time. Here it wasn't there for the termination fee because the fact was they were proceeding with the transaction. There were other fees which we identified. But importantly about the language, the language says you get it even if the deal is not consummated under the NextERA plan. So there was an opportunity where some fees could have been had the NextERA plan gone forward, but it didn't. So it's two points. One is the NextERA plan is void of initiative. So I think whether it's addressed in the NextERA plan doesn't mean it was addressed in any other plan. They have to argue it's addressed in every plan because in every plan, as a matter of bankruptcy law, has to address administrative expenses. Isn't our question what the merger agreement means when it talks about administrative expenses of the debtors' estates addressed in the plan? I mean the plan ultimately may be voided. But the merger agreement is the agreement between the parties and they were talking here about those administrative expenses with reference to the plan. But we're looking at the administrative expenses that were discussed here in an agreement that says by its terms it's surviving a failure to consummate the merger. It didn't survive the termination and being void of a plan of reorganization because it had to be addressed in a specific plan. Yes, had that agreement been terminated and the NextERA plan gone forward, it would have been addressed. That's not what happened. It was terminated and it wasn't addressed in any subsequent plan. So there's two arguments there. And then there is the argument that being addressed in, we believe, had to be expressly addressed in if you're going to read that it's any plan of reorganization. But the parties are sophisticated. They specifically defined plan of reorganization as the NextERA plan and not any subsequent plan. We can't rewrite the contract that the parties already wrote. So, well, I mean, if the parties referenced the NextERA plan and said, these are how we understand the terms to mean, then the NextERA plan being void still provides meaning for 6.7 in the merger agreement though, right? That's an open-ended question, Your Honor. May I ask you what meaning you think it does provide? I'm sorry, I didn't follow. Well, so let me just say this. Your lead point is that the NextERA plan can't be binding because it's void ab initio. And I guess my point is, if 6.7 in the merger agreement are based on the NextERA plan, then at a minimum, even if the NextERA plan is void, doesn't the NextERA plan inform how terms in the merger agreement should be interpreted? I'm not sure that's true. And if you look at 6.7, let's read it together, it has four sections, 6.3, 6.5 of them, 6.3, 6.18, 6.19, 6.20, and 6.22. Stop me if I'm wrong, but that's not what I'm fixated on. I'm fixated on the disjunctive or after those four sections. But I think it's important because when you say or any administrative expense, I just gave you a list of five sections, if I counted right, and then an or, a disjunctive. The disjunctive is tied exactly to the NextERA plan. That disjunctive, hate to be formal logic, if that's false, your only other options are one through six, five, and they weren't tied to the NextERA plan. So, but here's my question. It doesn't say for administrative expenses of debtors' estates addressed in the plan of reorganization that is approved by the bankruptcy court or that is eventually consummated, it just says that are addressed in there. And so I guess my thought is at one level, maybe everyone was thinking that it would be consummated, but doesn't it provide definition at least for what administrative expenses are there because we're referencing something to define administrative expenses. That NextERA plan lists administrative claims as having four components. If this were to just have listed those four components without the cross-reference to the plan of reorganization, we'd say, oh, that's what's in play. And so I guess my question is, why should we view this as anything other than a cross-reference? Because, again, when you go back to 8.5b, where they cover the expenses, it says it's its sole remedy. So this would have had to be something other than the expenses covered by the termination fee. Expenses covered by the termination fee by its terms included the component of expense reimbursements such as professional fees. Correct. That are documented. Correct. So if NextERA had done something, let's assume NextERA had a contract. I can give a hypothetical. Had a contract totally unrelated to the termination fee. It was giving power to Encore, which it wasn't. But then you could get that expense, but that's not the kind of expenses. I think this went to your Honor's question originally. Is this a carve out or is this in addition to the expenses covered by the termination fee, which the Bankruptcy Court clearly said you can't get them related to the termination fee. You can come back on an administrative expense. Let's see your application. Can you carry your burden? What they did was they came back with, again, termination fee related expenses. They then had to say under 503b1, I have to show a plausible claim. What the Bankruptcy Court, that's a heavy burden, as I mentioned before, 503b is an exception. It takes money out of unsecured creditors pockets, hopefully to get them more. But as 503b means you had to have an actual necessary expense to preserve the estate. As Judge Sanchi found, and it was found not to be an abuse of discretion, the risks were too great. So they have to go outside the contract. They acknowledge that. How do they acknowledge it? They now try to plead a tort claim at the last minute that was never in the request. And they plead that as their very first argument on appeal or the second argument on appeal. And so they realize that they can't go outside of the contract because contract 503b1, they didn't prevail. They didn't even at the Third Circuit. They, in fact, were detrimental to the estate. That's doing an evaluation and balancing as to the termination fee. And as even the Bankruptcy Court made clear in its administrative expense decision, that's a different issue than evaluating the benefits from the particular expenses issue, right? Well, but again, to carry, you still have to do a balancing a test with respect to whether those expenses did, in fact, preserve the estate. Isn't that the nub of the issue here? Because where has anyone actually done that other than simply assuming that because of the decision made on the termination fee, that that carries over to a particular administrative expenses? When O'Brien indicates that you should be looking at the particular benefits, and those benefits can include increasing the likelihood that the price at which the debtor is sold is reflecting its actual worth, even if that actual worth is lesser than the parties initially thought. And I would ask, Your Honor, two points to that, Your Honor. First, I don't believe that the balancing actually had to be done as a matter of law. And this is perhaps different than what, Your Honors, when you have a standard complaint and you haven't lived a four-year bankruptcy case, which is also what Judge Andrews looked at. And that's why when we put a record up on appeal to you, you will usually get so many documents from a bankruptcy court, plans of reorganizations, all of those other events, because importantly, 503B is a contested matter in a bankruptcy case. It is not an adversary proceeding, unlike the complaints. The judge who has lived it for four years can take account of all of the facts that have been determined before him and look at the expenses. So when confronted with this particular application, there was no fact-finding to be done. The facts had been found. The facts had been found that one $50 million a month while they pursued the appeal after the deal killer terms. The deal killer terms to the date it was terminated was at least three months. Second, uncontested fact, the court had approved the transaction for $300 million more. Fact, Nextera refused to terminate the agreement. There's no further fact-finding when looking at that burden, which is exactly what Judge Andrews also looked at. There were no set of facts, whether that was $60 million or more, that would have outweighed the detriment to the estate. There could be no finding of necessary to preserve the estate when the estate and creditor's recovery was diminished by close to $500 million. You keep referring to these terms of hundreds of millions of dollars. Maybe I'm misunderstanding, but I thought Nextera was at $9.5 million and SEPA ended up at $9.4 million. There was a difference. It was a different number. It was actually lower. I'll defer to Mr. Kane to give you better on the math because he lived that transaction, but I believe it was $300 million to $400 million less when you looked at the consideration, but I'll defer to him on that part. With that, should we move on to Mr. McCain? May I just make one more point, Your Honors? I think one thing that you should look to, and again, look at Reliance, the other Third Circuit opinion, because there is no facts in here with respect to the inducement and the facts. With respect to that, there has been no evidence to that that they wouldn't have bid otherwise, and if you look at it, I think it's a very telling decision how the judge who denied the termination fee in that example treated it. The other thing I would ask Your Honors to look at is with respect to the fundamental fairness point, it was not raised in the application, and again, if you look at the Reliance decision, it is specifically said to be a different claim or cause of action and therefore was found to be waived when it was not raised in the initial complaint. Very much whether you had the same facts or not, the party was found to have waived the fundamental fairness argument. And then finally, with respect to the PFH and prejudice argument, there is no basis for going for an administrative claim because of unfairness or prejudice, because Judge Slobodur in O'Brien, Judge Greenberg in Reliance specifically, and Judge Walras specifically says you have to be based on a statute, a provision of the bankruptcy code. Bankruptcy Code 503B1 does not say you can pay an administrative claim if somebody has been prejudiced, and we believe the Third Circuit was ruling that the prejudice had already been taken care of by having such a heavy burden to carry with respect to the reconsideration motion. So is it your position that prejudice is an appropriate consideration in evaluating a 503 claim, but it's not a freestanding basis for administrative expenses? Actually, Your Honor, I don't believe prejudice is a factor to determine 503B because prejudice is what we call 105 in my world and equities. 503B says it must be actual and necessary to preserve the estate. If somebody suffered prejudice, you took my property and it benefited the estate, I don't get a 503B claim unless I make a stealing or a tort claim. And if you look at the application itself, there was no allegations of tort, negligence, misrepresentation, and it's too quick to say you could go back and amend. They chose to take an appeal. They did not choose to amend their application when they filed it and when we had gotten the reconsideration motion. Where in Redding does it root the idea of fundamental fairness in 105? In Redding, again, the statute before that, they used the exact same statute, 46. And when they did in fact grant it, if you look at the very end of Redding, there is this section. I have the paper copy if you don't mind if I look at it very quickly. And it says because the receiver was taking actions to maintain and benefit the estate, then a negligence claim arising out of that could in fact be an administrative claim under Bankruptcy Act 46. And that's because the activity that the receiver was doing, though negligent, still was doing something for the benefit of the estate. That is different and that's a tort. And if you look at Judge Walrath on First Women, she goes back, even on a fundamental fairness, and says you've still got to go under 503B and come up with actual expenses that are necessary to preserve the estate. Did they really have a full opportunity to present their arguments that negotiated settlement agreements to the extent that those were carried through and expedited the ultimate closing? With SEPA, the documentation in terms of providing a template for the plan, the likelihood of it being sold for its true worth and being able to ascertain the true worth for bidders who were coming in to know that they didn't need to and shouldn't take the time to proceed with regulatory approvals. Your Honor, you had the opportunity to argue that those things were not reimbursable administrative expenses as opposed to the termination fee. But again, Your Honor, those things done, even if you give it credit for being done, again, standard of motion to dismiss, take it as true. They want $60 million. It costs much more than $60 million. So even assuming it is true, that's not a plausible claim to say those expenses were actual and necessary to preserve the estate. They diminish the estate, and you can look at it. To me, that really comes down to kind of where are we procedurally with contested matters that you're going to tell me if I get bankruptcy code wrong, have to proceed by motion versus adversarial hearings, adversarial proceedings, which kind of are farmed out more in the kind of standard litigation way. Maybe I misunderstand that. I'm happy to be correct at any point in time if I do. But don't, I mean, doesn't kind of turn on that because if we're really just going to say we're going to strictly apply Iqbal's 12B6 to a contested matter, it seems that they're saying, we think we provided a benefit. And I think you're saying, oh, no. Oh, no. This was actually a net loss. And that, to me, begins to feel like, oh, we actually have a dispute of fact because your allegations of net loss have to be vetted and determined through a more amplified process and can't be kicked out at an Iqbal-Twombly stage. So I think what I'm doing is I'm assuming that they've got to the point of demonstrating that they had a post-petition transaction. That's rooted in statute. And I'm assuming for the sake of argument that they've proved that there is some benefit. The question that the benefit's swallowed by the harm feels that that's a question for another day. I put a lot on there. So go to town if you don't like any of it. I will, if Your Honor doesn't mind. I think if this was a standard complaint where you had nothing else, I could understand that. But you have to put it in the context of 503B, the burden, and the standard applied by O'Brien. One, it's an exception. You're asking them, the creditors, to bear the burden. Two, the debtor has a fiduciary duty to maximize the value. So when you put it in that context and you give them – think of it in terms of when you have to plead fraud with particularity – this is very much the same because you have the heavy burden to show that a judge that has sat there for four years, seeing all these facts, knowing all the instances, that that judge says what Judge Fauci said is, I've sat here for four years. I'll give you your best case. You cannot carry your burden to state a claim under 503B1. It's not plausible, given your burden and given everything in this case. But that's the real trick, right? I mean, maybe that's the nub of the issue. Because Yvonne Twombly say, we assume as true allegations and we take reasonable inferences in favor of the plaintiff. And so I guess what you're saying is, instead of assuming those is true and instead of giving Nexterra the benefit of reasonable inferences in this context – I think it's a legal argument that you're making, maybe I'm wrong – you're saying, trust the bankruptcy judge because the bankruptcy judge has already been the referee over this for quite some time. Well, there's a lot of that. And even in the Nexterra and the appeal in the Third Circuit, it's exactly that that the Third Circuit said he didn't abuse his discretion. It is not nearly enough to show a benefit. I can give you examples where I plant flowers on your yard, I gave you a benefit. You don't have to compensate me for any benefit. Well, you need a transaction first. I mean, I think that's why you have to have a post petition. Okay. I mean, that's the first prong, right? Okay, but again, if you think there's a transaction, you can't go to the tort. If you go to the transaction – Okay, fine. For the sake of argument, I just want to go straight ahead down the road. I don't want to take – Straight to the transaction. Now it's based on a terminated transaction. Again, we've argued expenses are not there. But let's assume it was expense only. Let's assume 6.17 didn't stop them from seeking their expenses. This judge had all the right with the facts in front of him, and this is what Judge Andrews, he has sat there for four years. I'll give them their best case. They're saying, I created 60 million of value here. You didn't carry your burden. You didn't carry your heavy burden to put that 60 million on the unsecured predators that will be detriment to the detriment, dollar for dollar for dollar, because these facts in this case are unassailable, and you cannot overcome those facts. That is not fact-finding. That is taking the facts, just like a standard motion to dismiss, and saying, those facts are simply not adequate to carry your heavy burden under 503B1. Hopefully, I've left enough time for Mr. McCain. Judges, Mark McCain, Kirkland, and Ellis, on behalf of the EFH Applied Administrative Board, what you may not appreciate is Mr. Ghilardi and I are typically adversaries, and so he will find this particularly amusing, that I can't agree more with what he has argued. What I really want to get to is this concept that this is not an adversary proceeding, meaning this is not a full standalone piece of litigation that we have in the bankruptcy courts. What I want to explain as best I can is just the context and the structure. It goes a lot to what Mr. Ghilardi was discussing, and then I can answer some specific questions, I think, Judge Krause, with regards to merger consideration and other things. There are two types of disputed matters in the bankruptcy courts. There are what are called contested matters, and there are adversary proceedings. That is Federal Rule of Bankruptcy Procedure 9014. An adversary proceeding is just like district court litigation. The full set of Federal Rules of Bankruptcy Procedures apply, and it's complaint, answer, motions practice, full discovery, and contested matter is motions practice. The vast majority of what we do in bankruptcy court is motions practice with declarations and a hearing, and that's why when you look at the start of 503 and 503B1, it says after notice and hearing, because when you go forward in a contested matter, you provide notice to the entire parties and interests, the constituencies, and then there's some form of hearing. What Mr. Ghilardi did on behalf of his clients in response to the Nextera application was to simply say, we can cut through this by just evaluating the application that's filed and evaluating the merger agreement. He essentially used 12B and 56 to probably give the court some type of context and structure for it, but what he's really saying is we do not need to go on to a full hearing on this, on the facts, because we can accept everything that Nextera put in that application. Then evaluate it with regards to the remainder of the case, and it's absolutely appropriate to do that. That's what bankruptcy courts do, and then to just say, is this sufficient? It was a sufficiency type of analysis, and what I'm trying to find for you, when you see an adversary proceeding, it gets a separate number. It actually starts in a case, and it's the classic plaintiff versus defendant relationship. This application, as are all administrative applications, are filed in the main case. That's the moment the 12,000 docket entries. When it's filed in the main case in front of Chief Judge Sanchi four years into this bankruptcy, he looks at that administrative claim and says, I know this case. I have lived this case. What you're telling me, based on this application, there were two theories that they went under. One was 503B1, administrative claim. The other was a substantial contribution claim. That's not before they stopped that train. They didn't even pursue that. They were coming forward at the end of the case, which is typically when you have an administrative claim, and you look back, because 503B1 requires that there actually be actual and necessary costs and expenses to preserve the estate. That's the language of the statute. You actually have to have incurred the costs. Then you, as the counterparty or the claimant, come forward and say, I have incurred this cost, but it has yielded a benefit to the estate, or it has preserved the value of the estate. That is why I am asking the court to shift my obligation onto the creditor constituency. That's why it comes in at the administrative claim level, and that's why it pushes everybody else down. When you're in that situation at the end of the case, Judge Sanche is looking at this and saying, I understand this. Basically, he tells us that two-thirds of the Nextera application is just a recital of the facts that Judge Sanche knows all too well, from the transaction itself to the reconsideration motion. The final, I'd say, three pages is a detailing of the specific expenses that they are asking to be put on the estate. What he is saying is, I will accept everything you say with regards to this, and then I have to evaluate under 503B1, was that an actual and necessary expense to preserve the estate? That's when, Judge Krause, to get to your point, I can answer the consideration issues. A lot of times in bankruptcy court, we talk about total enterprise value for a purchase price, because the consideration is going to be both in cash and an assumption of debt. That's when you see the $18 billion number being thrown around. That's both equity and debt being assumed. The final Nextera purchase price, in terms of equity, was $9.8 billion in cash. We're trying to do an apples-to-apples comparison just on purchase price or merger price. It's 9.8. Your Honors, all of this is actually reflected in the transcript at the district court in front of Judge Anders. We had the same colloquy. It's 9.8 for Nextera, 9.45 for the final merger consideration of the Semper transaction. That's where the $350 million delta comes. Just between the two merger prices, that does not take into consideration the $50 million a month of accrual of two primary costs. The cost of running one of the largest bankruptcies of all time, all the professionals that are able to look to the estate, as well as secured interest. The EFH secured interest is something that accrues during the entire case. That's how you get to such a big number. It was $50 million a month. That was not an issue. Why should that be laid at the feet of Nextera? At that point, there wasn't another bidder in the picture. At that point, it appears the debtors were still encouraging Nextera to pursue the appeals in the hopes of being able to consummate their transaction. The debtor was contractually obligated to support Nextera on the appeals. This goes back to the earlier panel from the Third Circuit. Was there a belief, and is there now a conclusion based on earlier decisions both by Judge Sanchi and at the Third Circuit level, that Nextera waited the debtors out? That essentially, once the Public Utility Commission first said, your deal killers are the opposite of our deal killers, we're at a direct impasse, and then they've waited for the entire 30 days, and then they filed their first appeal, and they filed their second consideration, that Nextera was knowingly waiting it out. Because this was the ultimate issue, and this is important from a contextual standpoint. Nextera, in its papers, tries to present this world as, I will get my termination fee, or I will get my closing. I'll get one or the other. The contract, and specifically in 8.5, provides for three scenarios. We laid this out, the PAB laid it out at the start of its brief. There are three large scenarios that play out here. Step one is the transaction closes. If the transaction closes, there's no termination fee paid, and the benefit that Nextera gets is encore. Scenario two is the transaction does not close, but it does not close for a reason that allows for the termination fee. And that's some of the scenarios in 8.5b, but not all the scenarios in 8.5b. Third grouping is the transaction doesn't close, but it's for a reason that doesn't give rise to the termination. And the big one is if Nextera terminates. That's the one that created all the kerfuffle in the earlier appeal process. If Nextera had simply terminated, it is not entitled to the $275 million. And so by waiting it out and forcing the debtors to terminate, and why did the debtors have to terminate? Because the debtors have a fiduciary duty to maximize the enterprise value of the estate. That's not just in bankruptcy law, that goes back to Delaware fiduciary law as well. And to maximize the value of the estate, it has to get the highest value it can, but it also has to reduce the costs, reduce the claims. And the $50 million is so important because every month that it's in bankruptcy, it's accruing $50 million in additional claims. I guess why I'm a little confused is it doesn't seem like they had another solution. They ended up terminating it later, right? So the debtors end up pulling the plug later. They could have pulled the plug earlier. Either way, until they had some other solution, they were going to be incurring costs, right? And the issue is, why did the debtors delay in pulling the plug? I don't think they delayed at all, but they ultimately had to terminate to take a lower purchase price. This is the difference between evaluating, were they a proper stocking horse and they got additional value for the estate, but then lost out on the asset? Here, comparing merger considerations, which is what you do, we sold the same asset every time, right? We ultimately sold a separate, we got materially less. Well, I mean, I think, let me just ask this question. I mean, I think it's really nice and helpful, your kind of explanation between adversary proceedings, which is probably something we're all more comfortable with here, at least, because that's more just straight SIPRA than contested matters, which is kind of this weird combo of motions. But in terms of standards of review, let's just say the judge saw she went the other way and said, look, I'm looking at these administrative expenses, and the way I find the facts, it's not 60 million, it's 200 million. The termination fee provided a pretty good metric for that. That's probably why people agreed to it. It's a little discounted. Not to say $75 million is a little discounted, but it's a little off. And now the tables were turned. And you said, that's way too much. Judge saw she completely misconstrued the facts. What lens do we look that through? I mean, are we looking, because I mean, I've read the last three pages of the opinion. And there's a lot of stuff that's cited in there as fact. It's not sourced. It's not documented. It's not saying exhibit A, exhibit B, contract, testimony. That's how I'm typically used to reading a district court opinion that says, these are my findings of fact. And here, there's no sites to a record. There's nothing like that. And granted, I get that maybe that's not needed because there's kind of a personal knowledge component to it. But my point is, assume it was flipped. Would you just say, oh, got to go with the bankruptcy judge said, or would you say, no, there's a problem with the standard of review? And I think this is an issue for your consideration. I think if you looked at an appellate court, at bankruptcy court decisions, and you saw this in the reconsideration discussion as well, they are largely made on an abuse of discretion review. They're largely based on like, looking at what the, I know that this judge knows this case far, far, far better than I do. Do I need to defer to the bankruptcy court in its determination, rightfully or wrongfully? I think there's a very good argument that an administrative claim review like this would merit an abuse of discretion review. And your honor, I'm being responsive to what you're saying with regards to how do I address this situation. An administrative claim in the main case, and I said application, that's just a parlance. So let me just press you on this. If that's true, then you don't care about ICFAR. You don't care about Quambley. You don't care about Anderson versus Liberty Lobby. You don't care about Massacheta. You don't care about half the Civ Pro book, maybe more than half the Civ Pro book. You care about abuse of discretion for contested matters. And I'm not saying that's wrong. I just want to know what your position is because it strikes me that if we take this, and this is why it's important, if we take this to an ICFAR versus Quambley analysis, then it seems that there's been something pleaded that needs more, that would typically get a little more treatment. If we treat this as something completely different, then no. To the extent I can, and there will be limits. But let me do a couple things. So in Federal Rule of Bankruptcy Procedure 9014, which is where you start to get the vision. That's contested matters. Am I wrong? That deals with contested matters exclusively. If you look in Section C, that's correct. And if you look in Section C, it says which rules of civil procedure apply and which rules of civil procedure are silent. And the whole panoply is in adversary proceedings. In contested matters, Rule 56 is in there. Rule 26 is in there. Rule 12 is not. What are the contours of that discretion? I mean, abuse of discretion, and we still have to review. What are the contours of it? Well, and I think it was helpful the way Mr. Ghilardi presented the issue to the judge, which is saying, judge, accept everything they're saying, knowing everything you have in the record. And while Judge Sanchi's decision isn't fully ticked in time like you would expect a full trial or decision to be, it is fully supported by the underlying record that was in front of him. And that's when, Your Honor, when you look at Judge Andrews, who again, Judge Andrews doesn't know the record as well as Judge Sanchi, but he had over a dozen EFH appeals. He was the lucky winner of that. So when he got that, you know, this was not his first EFH rodeo. And so he knew this record. He was simply saying, now remind me again, which bidder was this? Because there were a series of failed transactions. And so as a result, Judge Andrews was saying, like, all right, I know. And we were able, and you can pick and tie that record. And that's one of the reasons why he felt comfortable, you know, coming to the conclusion that he did, which is I know this is $350 million left. And to your concerns about the basket of assets, I think Mr. Ghilardi's brief did a very nice job of laying it out. How do we know it didn't preserve the estate? It didn't preserve the estate because the same creditors that were forecasted to get $0.10 on the dollar, the unsecured creditors of EFH were forecasted to get $0.10 on the dollar in the next era plan. And ultimately were forecasted to get less than $0.30 on the dollar in the transaction that actually closed. So I hope that helps. There is one point I want to flag for you all with regards to 6.7. And I don't want to open up a panoply. I know you've had a very long day. But Mr. Ghilardi made a comment. I really want to emphasize this. When you're looking at, in 6.7, the specific language, Judge Fitz, you were worried about, like address in the plan of reorganization, this goes back to a little bit of bankruptcy. As debtors, we cannot confirm a plan of reorganization. We cannot emerge from bankruptcy under the Bankruptcy Code unless we pay all administrative claims in full in cash. That is a requirement of the Bankruptcy Code. Specifically, Section 1129A9. So there's a whole set of requirements that we have to satisfy in a plan of reorganization before we can emerge. They're typically compiled in 1124 and 1129. 1129A9 specifically says we must pay administrative claims in full. So when you look to the next era plan, even if I accept your argument that that is a writing that is memorialized that can give meaning to 6.7, even accepting that, if we look to that writing, when you see the language in Section 2, Article 2A, Administrative Claims, when you see generic statements like that are being relied on by Mr. Bonner, that the debtor shall pay all administrative claims, and that's what he referred to in his letter in response to the panel's inquiry on this issue. He specifically said it discusses administrative claims, it talks about how they're going to be paid. I have to do that as debtor's counsel. I have to articulate how I'm going to do it because I have to show that my plan satisfies the Bankruptcy Code. But that one section addressed four categories of administrative claims. 503C was just one of those. So I could see the point being, oh, we didn't even need that, nothing of that sort, if it was just one category. But it was four categories. So the fact that it's four categories suggests to me that it gives broader meaning than just the 503C meaning. And I'm sorry, but I have to push back because if you look at those other categories, those other categories are obligations that have to be satisfied to emerge. The Bankruptcy Code requires that professionals also get administrative claims, essentially the same priority status, so that that's a way of incentivizing debtors, people to help debtors, and ultimately help creditors. And so what I'm flagging for you is with regards to Article 2A, the statements with regards to paying administrative claims specifically is really just a contractualized version of the code. It's nothing more than that. So when you say, is it addressed in the plan, it would have to be more than that. I say that because 6.7 is a section of the agreement that says we shall all bear our own costs. Each party bears their own costs with two sets of exceptions. One we've already confirmed doesn't apply. Right. Those are the five sections that we've already covered. And the other is, as addressed in the plan. And what I'm saying to you is to appreciate from a Bankruptcy Code perspective, did that language give meaning? In other words, is there something in there about Nexterra in particular? The answer is no. Because all that's in there is just a statement, we'll pay generalized claims. You just revert back to 503B. But that means the prior panel in this case was wrong, right? I mean, that means the prior panel that seemed to think that it was termination fee or, you know, potentially as a backup plan, administrative fees, that was wrong. I don't think that they were wrong. I think that's what the prior panel thought. I've read that a few times. I really think that's what they thought. And now what you're saying is that can't ever be right because of 6.7. Let me just clarify. I don't think that panel got it wrong. I don't think they were focused on 6.7. That wasn't part of the issue in front of them. What they were saying was, I think what they're saying was, I have to decide what's in front of me. I know there are means for which to... But I think that they're trying to decide if that reconsideration was prejudicial or not. And one of the reasons they said it probably wasn't because there was a backup. There was the ability to seek administrative expenses. And so if that's wrong, if that's truly wrong and 6.7 precluded that, then maybe their analysis is, that would affect their analysis because I think a huge part of their analysis was we aren't saying 275 or zero. We're saying 275 or potentially 60. And now the answer is it was 275 or zero. And their analysis was driving how big the prejudice was. And maybe that last 60 million wouldn't flip the result. Yeah, I'm not certain I can agree with that. But I do think in Judge Greenway's decision, in the majority decision, the concerns about reliance, where they were satisfied that there wasn't prejudice here, was focused on the heightened standard of review under Rule 59. And it specifically said with regards to prejudice, general principles of reliance, importantly, were adequately protected, past tense in this case, by the heightened standard of review. So I think the key focus from Judge there was, I understand there could be prejudice. I believe that prejudice was at least addressed by the heightened standard of review. And we recognize that there may be other vehicles. Notably, that's why Nextera filed under two scenarios. It basically said, look, I think I conveyed a substantial benefit to the state, a substantial contribution. That's another independent means under the code by which a constituent can recover, even if they've agreed to bear their own costs. If they come forward and say, and this is the substantial contribution case law, basically says this follows. If I did an act that not just benefited myself, but benefited a larger constituency of everybody, I can file a similar application. I can come forward to the court and ask the debtor to pay me for that benefit, because it's helped everybody. And that's another means by which you can come to the court and ask for the debtor and its other creditors to assume your costs. That is something Nextera did here. And that was dismissed. Judge Cox, we seem to have gone way beyond the specific arguments before us. Perhaps we can move on to Mr. Ballmer and wrap up the arguments. Well, I've got a couple more questions for Mr. McCain, because on the issue of abuse of discretion, it looks to me in the opinion that, at pages 19 to 21, 22 of the opinion, that the Senate court laid out four grounds for saying I'm not going to find expenses warranted under 503. One was that Nextera couldn't close the deal because of lacking regulatory approval. One was that there was eventually a closing that was at a lower price, and that there was not a tort as there was in Women First. Are those really all appropriate considerations under 503, or do we need to perhaps clarify what constitutes a benefit under 503 under O'Brien? For example, missing from this analysis is any reference to the notion that it constitutes a benefit to the estate if the party has helped ascertain the actual price at which the debtor could be sold reflecting its true worth. And it seems that certainly in ruling out that the PUCT was going to approve these conditions, that that's at a minimum. Didn't Nextera do that? Yeah, I think this goes to the whole discussion of is all benefit or any benefit enough, or do I have to revert back to the code language of preserving the value of the estate? And I think the key language there in the O'Brien discussion, because it does talk about benefit, is the court in O'Brien was very explicit that it wasn't creating a new consideration other than 503B. You have to still satisfy 503B. And so as a result, in evaluating whether there are benefits, those benefits still must be necessary and actual and must preserve the value of the estate. A benefit in and of itself is not enough. And that is exactly what was argued in front of Judge Andrews, and Judge Andrews also rejected that. Okay. Mr. Bonner, we'll give you your few minutes for rebuttal. I think you're on mute. I was going to do that, Your Honor. Sorry. I'll try to be brief. There was some criticism in the arguments that we didn't terminate the agreement. I think that, again, debtor's conduct is at odds with this criticism of Nextera. They were supporting this transaction until nine days before they terminated it themselves. They were making arguments before the PUCT that these burdensome conditions should not be applied. And I think it's very interesting for counsel to say, well, we were contractually obligated to do that. We really didn't mean it. Of course, you know, this is one of America's elite law firms. They have ethical obligations. They meant it when they said it. They thought that these conditions shouldn't be applied. And they decided that they would support our transaction until the moment that they secured an alternative bidder. The women's first decision, I think it was used by them. They say it supports their case. I think, actually, it supports our case 100%. We have an alternative transaction that was proposed that was not actually fulfilled to fruition. Another bidder came in. And in those circumstances, the court allowed the first bidder, some company, to collect its administrative expenses. And it allowed some company to collect its administrative expenses, despite the fact that there was a specific contractual provision that limited it to a certain dollar amount. The court said you can collect those. But the ultimate transaction price was higher. But, Your Honor, that gets back to the valuation issues that you and I had discussed earlier. Yes, the transaction price here was lower. But this knee-jerk analysis, transaction price lower, no benefit, it doesn't make any sense. They decided, of their own volition, to go and sell assets that were less valuable than the ones that we wanted to purchase. Purchasers want control of their assets. They want to be able to appoint the board of directors. They want to be able to declare dividends when they want to. And that's why we showed that the PUCT would never approve a transaction that had those normal terms. And the debtors decided that they didn't want to wait out the appellate process, and they would rather go for the bird in the hand. But that's their choice to sell less valuable assets. I do think that Women's First really supports our side of the equation, Your Honor. There is so much discussion about the standard of review here and this idea that the judge could just decide what he wanted to decide in the bankruptcy court. I have before me two pages from Mr. Ghilardi's brief. It talks about the standard of review on a motion to dismiss. I could have written it. I don't understand what this idea that was introduced today for the first time has to do with anything. They filed a motion to dismiss, and they filed a motion for summary judgment. In this court, they told the court that the standard of review is the same standard as a motion to dismiss. So this idea that we can let the bankruptcy court decide what he wants in a motion to dismiss context, that's something they made up out of whole cloth, and they made it up today. They didn't even make it up in their appellate briefs. Mr. Ghilardi slipped at one point and he said, well, we have to have a balancing test with respect to whether an ex-servant's actions benefited the estate or did it harm the estate. Well, that's exactly my point, Your Honor. A balancing test classically is a question of fact that can't be decided in the context of a motion to dismiss, and the bankruptcy court did that here. Section 6.7. We did go over this to some extent in my opening argument, but I'll just very briefly say that Mr. Ghilardi wants to transform the words addressed in, which is the language of Section 4 and 6.7. He wants to transform that into paid pursuant to, that it had to be the next era plan that became effective in order for those administrative costs to be reimbursable, but that's not what the contract has to say, Your Honor. All it says is addressed in the next era plan, and these expenses are addressed in the next era plan for the reasons I expressed earlier. Mr. McCain and Mr. Ghilardi tried to say that we harmed the estate because they got a lower dollar value at the end of the day, and they paid these interest expenses. We're shifts passing in the night here. They never say that they sold the same assets to SEMPRA. You can't say that in the market for corporate control, that lacking the ability to appoint directors and lacking the ability to declare dividends is worth as much as an unfettered asset. So when they use these numbers or they say we didn't benefit the estate, they're absolutely positively wrong, Your Honor. And again, the experts, the investment bankers and economists will come and they will tell us how much less valuable these assets are. Thank you, Mr. Bonner. All right, Your Honor. Thank you very much for your time. We really appreciate it on a holiday weekend in particular, and I wish everyone a safe and healthy, happy holiday. We thank everyone for excellent arguments, for being very helpful in our marathon arguments this afternoon, and we wish you all a good, healthy, safe holiday.